**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| William Jude Hart, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **RE PENDING MOTIONS** |
| vs. | ) | |
| | ) | Case No. 1:14-cv-013 |
| Leann K. Bertsch, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## I.      BACKGROUND

### A.      Procedural background

Plaintiff, William Jude Hart, is an inmate at the North Dakota State Penitentiary ("NDSP").

He initiated this action on February 6, 2014, with the submission of a pro se complaint following

the form prescribed by this court for prisoner civil rights actions.

Hart alleged in his complaint a single claim of racial discrimination and sought only

declaratory relief.  In relevant part, Hart alleged the following:

**V.      Statement of Claim**

A.      Claim No.  1: The North Dakota State Penitentiary and Rough Rider
Industries in violation of the 14th Amendment of the United States Constitution (the Equal
Protection Clause) refuse to allow me to both work at Rough Rider Industries and attend
Read-Right Classes just as they allow other inmates to do.  This decision is based on Race.

.      * * * *

**VI.      Relief**

This Court should declare the policy at the North Dakota State Penitentiary allowing some
inmates to be employed and not have completed their educational requirements to be equally
applied, either everyone complies with the required educational policy, or there should be
waivers available to anyone eligible, equal treatment, equal protection, not based on race as
it is now.

(Doc. No. 2).

Hart named as defendants Leann K. Bertsch, Robin Schmalenberger, Rick Gardner, and Bruce Korte, stating he was suing them in their official and individual capacities. Bertsch is the Director of the North Dakota Department of Corrections and Rehabilitation (NDDOCR). Schmalenberger was the NDSP Warden when this action was commenced, but she has since left this position. Gardner is the Director of Rough Rider Industries ("RRI"), which is a division of the NDDOCR and operates prison industries in several of North Dakota's penal facilities including the NDSP. (Doc. No. 32-1, p.1). Korte is the RRI's Penitentiary Industry Manager. (Id. at p. 3). It is presumed from these job descriptions that Korte is Gardner's subordinate and is the person directly responsible for the RRI's activities at the NDSP.

Following an initial screening of the complaint pursuant to 28 U.S.C. § 1915A (Doc. No. 8), Hart responded to deficiencies noted in the court's screening order by submitting a proposed amendment to his complaint, which, in relevant part, alleges:

V.    **Statement of Claim:**

**A.    Claim No. 1:** During the Summer of 2013 the Plaintiff applied for employment at Rough Rider Industries (RRI), the industries program that is part of NDSP and the North Dakota Department of Corrections and Rehabilitation (DOC&R). The Plaintiff's application for employment was denied because it was stated that he did not meet the criteria of having received his high school diploma or GED as required to work at RRI. The Plaintiff had previously worked at RRI and had this requirement waived by the then director of RRI.

The Plaintiff was told that no inmates would be hired by Bruce Korte that did not meet this educational requirement and that the current director, Rick Gardner, would not waive any inmates of this requirement.

The Plaintiff claims that this denial of employment was based on race. The Plaintiff is Creole and when he worked at RRI previously he complained about Bruce Korte and other supervisors at RRI using the word "nigger" when referring to black inmates. So the Plaintiff is being singled out since there are currently non-minority inmates that are allowed to both work at RRI and attend GED classes or Read-Write classes which are taken as a prerequisite to the actual GED class.

The Plaintiff is not asking for special treatment, only equal treatment as guaranteed by the 14th Amendment of the United States Constitution, under the Equal Protection

Clause.

It is the Plaintiff's contention that Bruce Korte denied his employment application at RRI because of his race and the complaints he made during the four (4) years that he was employed at RRI, that Rick Gardner, as director of RRI, refuses to allow him the opportunity to be employed at RRI while attending Read-Write classes because he is Creole, and not white like the other inmates Mr. Gardner lets work while attending either Read-Write or GED classes, Robin Schmalenberger, as warden of NDSP has supervisory powers over RRI is allowing these discriminatory practices by employees under her supervision, and finally Leann Bertsch oversees the entire DOC&R, including NDSP and RRI, refusing to require her department to apply equal protection and treatment to inmates of all races.

(Doc. No. 9). Also, Hart expanded his request for relief to include injunctive relief, in addition to the request for declaratory relief, stating:

**VI.    Relief.** The Plaintiff asks this Court for a declaratory judgment forcing the NDSP and it's RRI to treat it's inmates equally and allowing the Plaintiff to work at RRI while attending Read-Write classes, and there should be injunctive relief granted stopping the practice of requiring some inmates to have a GED before hiring them and waiving the requirement for other inmates, allowing them to work at RRI while attending pre-GED classes, making it's policy less discriminatory against racial minorities. All inmates seeking employment at RRI should be held to the same educational standards regardless of race.

(Id.).

Following a further screening, the court determined it was not prepared to conclude no claim for relief had been pled and ordered service. (Doc. No. 11). The operative pleading is Hart's initial complaint as supplemented by his "amendment," which collectively will be referred to as the "amended complaint." (Doc. Nos. 2 & 9). See, e.g., Burns v. Morgan, 605 Fed.Appx. 596, 597 (8th Cir. 2015) (unpublished per curiam).

Giving Hart's amended complaint the liberal construction required for pro se prisoner complaints, it makes two claims:

1.    Hart was denied reemployment with RRI based upon intentional racial discrimination.

3.     Hart was denied reemployment by RRI in retaliation for having complained about Korte and other RRI supervisors at the NDSP making frequent derogatory racial

slurs directed to black inmates, including the use of the "N-word."
See, e.g., Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) ( "A document filed pro se is to be liberally construed, . . . and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers") (internal quotation marks and citing authority omitted).

Pending before the court now are two motions by defendants. The first is a motion for summary judgment. (Doc. No. 31). The second is a motion to dismiss claiming that developments subsequent to the commencement of this action have mooted any claim that Hart could make for declaratory and injunctive relief so that now there is no case or controversy for the court to decide. (Doc. No. 42). Whether coincidental or not, defendants' second motion was filed after certain representations made by defendant Gardner in support of the motion for summary judgment proved to be untrue.

There is also pending before the court a renewed motion by Hart to appoint counsel. (Doc. No. 44). The court had earlier denied without prejudice his two earlier requests for counsel. (Doc. Nos. 20, 22, 33, & 36).

**B.     Factual background**

The following facts appear to be undisputed or, for purposes of the pending motions, favor Hart.

Hart was employed by RRI at the NDSP for approximately four years from 2007 until midway in 2012, when he was involved in an incident of fighting for which he suffered 10-days disciplinary detention and loss of his job at RRI. Some months later Hart submitted an application to RRI asking to be reemployed. Hart states this was in the summer of 2013 while defendants state

4

it was in December 2012. For purposes of the pending motions, it probably does not make a difference, particularly if the motions are denied.

According to Hart, his request for reemployment was turned down by defendant Korte, the manager of RRI at the NDSP, because he did not meet RRI's requirement that inmates working for RRI must possess either a high school diploma or a GED unless the educational requirement is waived for extraordinary circumstances. Hart has submitted a copy of the communication rejecting his application, which reads as follows:

> The following is stated from Policy Number 14A-2, Page 2, Number 4 D:
>
> "An inmate must have a high school diploma or GED to eligible for placement in Rough Rider Industries. Exceptions may apply in extraordinary circumstances, at the discretion of the Director of Industries."
>
> The following is stated from Policy Number 12A-3, Page 2, Number 5 D:
>
> "Inmates must be in compliance with all rehabilitation recommendations for:
> A. Education
> B. Treatment
> C. Medical and Psychiatric
> D. Contracts with housing units
>
> You may apply at RRI once you have complete your GED
>
> *Bruce Korte*
> *RRI*

(Doc. No. 38-3) (Korte's name and "RRI" were handwritten). Defendants have not contested the authenticity of this communication.

Hart claims that, when he first applied to work at RRI in 2007 and was accepted, the Director of RRI at the time, Dennis Fracassi, waived the educational requirement. Defendants agree a waiver was given and have not claimed it was improvidently granted. Given this, and Hart being entitled to the presumption that RRI was following it own policies, it will be assumed for purposes of what follows that the waiver that was granted in 2007 was based on "extraordinary

5

circumstances."

Hart further claims that the reason why he was given a waiver in 2007 was that prison officials recognized at the time that he was not capable of meeting the educational requirement. Other than acknowledging that a waiver was given, defendants have remained studiously silent as to the actual reason for Hart's 2007 waiver and whether this is because the reason was never documented or because it is inconsistent with positions later taken by defendants as detailed below remains unknown.[1]

Defendant Gardner replaced Fracassi as the Director of RRI in 2011, making him the Director in 2012 when Hart's application for reemployment was denied.

## II.    HART'S CLAIM OF RACIAL DISCRIMINATION

### A.    Introduction

Hart contends that the real reason for imposition of the educational requirement, despite it having been waived for him previously and his having worked for RRI for almost four years without a high school degree or GED, is that he was discriminated against by defendants based on his race - particularly by defendant Korte.

Plaintiff's complaint clearly pleads a claim of intentional discrimination based upon 42 U.S.C. § 1983 and the Equal Protection Clause. In addition, it would also be fair to construe the complaint as encompassing a claim of intentional racial discrimination pursuant to 42 U.S.C. § 1981,

---

[1]  In an affidavit that defendants submitted in support of their second motion to dismiss, defendants state that an inmate hired in 1994 by the prior RRI Director received a waiver of the educational requirement because it was determined he could not meet it. (Doc. No. 43-2, pp. 1-2, specifically ¶¶'s 4-5). If defendants can determine the reason for the waiver for that inmate back in 1994, then presumably they could come forward with the evidence of the reason for the waiver for Hart in 2007. In fact, given the lack of any other explanation for why Hart had previously given a waiver and other inmates having been granted waivers because of an inability to meet the educational requirement, it is probably a fair inference (although one not necessary to resolve the pending motions in Hart's favor) that his waiver was based on the same grounds. And, while Hart has not made an ADA or similar claim under state law, the reason for his initial waiver is relevant to his claim that the reason for his denial of reemployment in 2012 was pretextual.

which prohibits racial discrimination in the making and enforcing of contracts. Cf. Johnson v. City of Shelby, Miss., __ U.S. __, 135 S.Ct. 346 (2014) (reversing grant of summary judgment because of plaintiff's failure to specifically invoke § 1983 in the complaint and stating: "Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. Rule Civ. Proc. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."); Solomon v. Petray, 795 F.3d 777, 786 (8th Cir. 2015) ("'When we say that a pro se complaint should be given liberal construction, we mean that if the essence of an allegation is discernible . . . then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework.' Stone v. Harry, 364 F.3d 912, 914 (8th Cir.2004)"). And, while there may not be any substantive differences with respect to these two grounds for relief in terms of a claim of intentional racial discrimination, there may be differences with respect to Hart's retaliation claim discussed later.    For the same reasons, plaintiff's complaint can also be read as encompassing a claim under Title VII of the 1964 Civil Rights Act of intentional racial discrimination.[2]  In fact, defendants have recognized this to be the case because they affirmatively argued in their brief in support of their motion for summary judgment that any Title VII claim is foreclosed by the failure of Hart to first file an administrative claim with the EEOC.[3]

---

[2]  The amended complaint does not, however, fairly state a "disparate impact" claim under Title VII based on the pled facts.  But, even if it did, the administrative complaint that Hart filed with the North Dakota Department of Labor does not include such a claim.  (Doc. No. 38-8).  Consequently, even if Hart was intending on making a disparate impact claim, he likely would be barred by the failure to raise it administratively with the EEOC unless there was some other administrative complaint that he filed.  See Shannon v. Ford Motor Co., 72 F.3d 768 (8th Cir. 1996) (each discrete claim must be presented to the EEOC for administrative exhaustion).

[3]  Defendants have not contended that Title VII was meant to replace a more general claim of discrimination pursuant to § 1983 and the Equal Protection Clause, and the Eighth Circuit has concluded that it does not with the consequence being that exhaustion of Title VII's administrative claim requirements is not a prerequisite to bringing a § 1983 claim for discrimination.  See Henley v. Brown, 686 F.3d 634, 642-43 (8th Cir. 2012).  The same holds true for

It is not clear, however, that no claim was filed with the EEOC. This is because Hart submitted with his response to defendants' motion for summary judgement a copy of a decision by the North Dakota Department of Labor ("NDDOL") denying an administrative claim for intentional racial discrimination that he lodged with it on June 4, 2013 (Doc. No. 38-8), and the NDDOL has a cooperative agreement with the EEOC, which makes probable that the filing of his administrative claim with the NDDOL was also a filing with the EEOC. See, e.g., Robb v. Roberts, No. 3:12-cv-96, 2013 WL 3244791, at 2 n.1 (D.N.D. June 26, 2013) ("The North Dakota Department of Labor and the EEOC have a work-sharing agreement. If a case alleging violations of Title VII of the Civil Rights Act is filed with either agency it is filed under both federal and state laws, and a single investigation is conducted by the Human Rights Division of the North Dakota Department of Labor."); 29 C.F.R. § 1626.10 (authorizing work-sharing agreements); www.nd.gov/labor (NDDOL website stating that it has a cooperative agreement with EEOC, last accessed on April 29, 2016).

At this point, whether Hart effectively filed a claim with the EEOC as well as complied with the other statutory prerequisites for making a Title VII claim appear to be fact questions that will require further proceedings to resolve. However, if the court denies defendants' motion for summary judgement as to Hart's other claims of intentional discrimination, the same reasons for the denial would apply to any Title VII claim that Hart might have.[4]

---

a claim of racial discrimination brought pursuant to 1981. Johnson v. Railway Exp. Agency, Inc., 421 U.S. 454, 460 (1975).

[4] That being said, if Hart wishes to proceed with a Title VII claim of intentional racial discrimination in addition to the claims he has already made, which do not require prior EEOC administrative exhaustion, he will need to be able to prove that Title VII's administrative claim process was properly completed, including demonstrating, as may be required, that he received an appropriate "right to sue" letter.

The Eighth Circuit has ruled that a Title VII claim is generally foreclosed if a plaintiff has not secured a "right to sue" letter from the EEOC. See, e.g., Hanenburg v. Principal Mut. Life Ins. Co., 118 F.3d 570, 573 (8th Cir. 1997) (filing charge with state department of human rights as plaintiff was obliged to do before filing charge with EEOC did not waive EEOC filing requirement or preserve right to assert a Title VII claim absent the requisite EEOC notification);

To avoid summary judgment of dismissal of his claims of racial discrimination, Hart must proffer either "direct evidence" of discrimination or prove that there is a sufficiently strong inference of it to create a jury question after application of the three-step burden-shifting analysis established by McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802–05 (1973) ("McDonnell Douglas"). See, e.g., Macklin v. FMC Transport, Inc., 815 F.3d 425, 427 (8th Cir. 2016) (applying the McDonnell Douglas framework to claim of racial discrimination under 42 U.S.C. § 1981 based on indirect evidence); Xuan Huynh v. U.S. Dept. of Transp., 794 F.3d 952, 958 (8th Cir. 2015) (applying McDonnell Douglas to a Title VII claim of racial discrimination based on indirect evidence); Burton v. Arkansas Secretary of State, 737 F.3d 1219, 1229 (8th Cir. 2013) (applying McDonnell Douglas to a § 1983 claim of racial discrimination).

**B.     Lack of "direct evidence"**

Direct evidence in this context is evidence that suggests a direct causal link between the alleged discriminatory animus and the challenged decision, and, in the Eighth Circuit, "direct evidence" is not necessarily the converse of circumstantial evidence.  See, e.g., Floyd-Gimon v. Univ. of Ark. for Medical Sciences ex rel. Bd. of Trustees of Univ. of Ark., 716 F.3d 1141, 1149 (8th Cir. 2013); Griffeth v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004); In Griffeth, the Eighth Circuit stated:

---

cf. Jones v. American State Bank, 857 F.2d 494, 499, 500 (8th Cir. 1988) (receipt of a right-to-sue letter prior to the filing of a Title VII action is not a jurisdictional prerequisite but rather a precondition subject to equitable tolling and waiver). However, none of these cases  specifically addressed whether a "right to sue" letter from the EEOC is required when there is a cooperative agreement with a state agency and the state agency has issued a "right to sue" letter. Compare, e.g., Stiefel v. Bechtel Corp., 624 F.3d 1240, 1244-45 (9th Cir. 2010) (concluding that a "right to sue" letter from a state agency with a cooperative agreement is sufficient) with Walls v. Dillion County Detention Center, No. 4:13-cv-02551, 2015 WL 1145231, *4 (D.S.C. Mar. 13, 2015) (concluding that, in the Fourth Circuit, a "right to sue" letter from the state agency is not enough and a separate "right to sue" letter from the EEOC is required).

The significance of all of this is that Hart's pathway to proving liability may be easier under Title VII in terms of the causation element and certain of the remedies. See, e.g., Desert Palace, Inc. v. Costa, 539 U.S. 90, 94-101 (2003) (discussing Title VII's evidentiary requirements and defenses).

> Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir.1997). Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part McDonnell Douglas analysis to get to the jury, regardless of whether his strong evidence is circumstantial.

Griffeth, 387 F.3d at 735-36; but see Torgerson v. City of Rochester, 643 F.3d 1031, 1053 (8th Cir. 2011) (en banc) ("Torgerson") (Colloton, J., concurring) (expressing doubt about Griffeth's definition of direct evidence in light of the Supreme Court's discussion of direct versus circumstantial evidence in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) and other Supreme Court precedent).

In this case, Hart has proffered three items of evidence in support of his claim of intentional racial discrimination. The first is the alleged "frequent" racially-derogatory remarks by Korte and his fellow supervisors. While in some instances proof of such remarks is sufficient "direct evidence," this is not true for stray remarks that are not specifically linked to the challenged decision, even when made by the decisionmaker. See, e.g., Floyd-Gimon, 716 F.3d at 1149-50; Torgerson, 643 F.3d at 1044-46 ("A remark by a decisionmaker, in order to be direct evidence of . . . discrimination must show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action."). In this case, the remarks Hart claims were made by Korte and others are not "direct evidence" given the lack of evidence of a specific link to the denial of his application for reemployment, including the fact that Hart does not claim the remarks were directed to him personally.

A second item of evidence that Hart proffers is the fact that he previously had been employed

for four years at RRI without a high school degree or GED, because the educational requirement had been waived by the prior RRI Director. Hart claims this is powerful circumstantial evidence that the failure to consider him was for another reason and, in this case, racial discrimination given the other evidence. Finally, the third item of evidence that Hart proffers is that RRI continued to hire other inmates, all of whom he contends were not black, who did not meet the educational requirement. Arguably, since there could be nondiscriminatory explanations for these items of evidence, neither are "direct evidence."

### C.    Application of the **McDonnell Douglas** framework

#### 1.    The prima facie case

Turning then to the three-part McDonnell Douglas framework, defendants contend with respect to the first step that the evidence proffered by Hart is not sufficient to make out a prima facie case of discrimination but offer little explanation in their brief for why that is the case.[5] In a single paragraph before proceeding to the second McDonnell Douglas step of offering what they contend was the legitimate, nondiscriminatory reason for why Hart's application for reemployment was not considered, defendants point to an affidavit of RRI Director Gardner without any further explanation, leaving the court to guess what more precisely their argument is. But, if their argument is that Korte was not the final decisionmaker as Gardner contends in his affidavit, Hart has presented the communication from Korte informing him that he would not be considered for reemployment until he first completed a GED and this creates some inference of Korte's involvement. Also, as will be discussed later, there is other circumstantial evidence from which an inference can be drawn that

---

[5] Hart contends, and defendants do not dispute, that he is of mixed black descent (Creole) and a member of a protected class. Further, in terms of Hart's qualifications for employment with RRI, defendants cannot reasonably dispute there was RRI work that Hart was qualified to perform (putting aside the educational requirement the enforcement of which Hart claims was pretextual) since he had earlier worked for RRI for some four years.

Korte was the effective decisionmaker. For these reasons, Hart has presented enough to make a prima facie showing that Korte's alleged racial animus was the reason why he decided Hart was not eligible for reemployment and, once Korte made that decision, it essentially foreclosed his reemployment sans a GED.

### 2. Defendants' claimed legitimate, nondiscriminatory reason

Under the second step of the <u>McDonnell Douglas</u> framework, defendants can offer a "legitimate, nondiscriminatory reason" for why the alleged adverse action was taken and if Hart fails to demonstrate that this reason was pretextual at the third step, then defendants prevail. <u>E.g.</u>, <u>Torgerson</u>, 643 F.3d at 1047-52. In this case, the only nondiscriminatory reason that defendants have offered is the one that was contemporaneously communicated to Hart by Korte, which was that Hart did not have a high school degree or GED. It will be assumed for purposes of the discussion that defendants have satisfied the second step of the <u>McDonnell Douglas</u> analysis thereby requiring the court to proceed to the third step.

### 3. Hart's arguments for why the proffered nondiscriminatory reason was pretextual

#### a. The educational requirement

Before turning to Hart's arguments of pretext, it is helpful first to consider in more detail RRI's educational requirement. The requirement that defendants point to is spelled out in a NDDOCR policy governing RRI, which, as noted earlier, is a separate entity, from the NDSP. The policy requirement reads as follows:

V.      <u>PROCEDURES</u>

* * * *

D.      Procedures and Eligibility Requirements for work in RRI:

* * * *

4.  An inmate must have a high school diploma or GED to be eligible for placement at RRI. Exceptions may apply in extraordinary circumstances at the discretion of the Deputy Director of Industries and Education.

(Doc. No. 32-3, p. 1). This policy was in effect when Hart applied for reemployment. It, or some variant of it, was also in effect when Hart first applied to at RRI in 2007 and was accepted. In fact, defendants acknowledge that the prior RRI Director had waived the educational requirement for Hart at that time. (Doc. No. 32-1, p. 3).

Several points about this policy are relevant to what follows. One is that, even putting aside how the requirement may have been enforced in practice, it is not absolute, even on its face. Rather, as the foregoing provision states, exceptions can be made.

Another point is that the nominal authority to grant an exception or waiver (again putting aside what may have been happening in practice) may have been granted to RRI's "production manager" as well as the Deputy Director of Industries and Education. This is because another provision under the same subpart V of the RRI policy (which defendants have not cited to) further provides:

V.  PROCEDURES

* * * *

L.  The Production Manager and the Deputy Director of Industries and Education are authorized to override any of the *above policies* for any individual worker, if and only if, the override is to the benefit and in the best interest of the inmate worker. Any policy overrides must be documented and bear the signature of the Production Manager or the Deputy Director of Industries and Education. The documentation will be placed in the inmate work file.

(Doc. No. 32-3 p. 6) (emphasis added). As discussed later, this may be relevant to determining whether in this instance Korte was the effective decisionmaker with respect to the denial of Hart's

13

application, including the determination that the prior waiver of the educational requirement should not be continued or a new one granted.[6]

Finally, relevant to the consideration of whether in any particular instance an exception or waiver should be granted is the reason for the educational requirement in the first instance. The RRI policy is itself silent on this point and the *only* reason offered by defendants is that the requirement is needed for the safety of RRI staff and the inmate employees. Relying upon RRI Director Gardner's affidavit for this point, defendants state in their brief:

> Hart was not denied employment with RRI because of his race, nationality, or on the basis of any other protected class. Gardner Aff. ¶ 25. The educational requirement for RRI applicants is enforced for the safety and security of the staff of RRI and inmates of NDSP. Id. at ¶ 20. The work inmates perform at RRI can be dangerous for themselves, and other if the inmates are not educated and do not possess the required skills to operate the tools and machinery. Id.

(Doc. No. 32, p. 10).

### b.    Evidence of pretext

A plaintiff can demonstrate pretext in a number of ways, including showing in this context that (1) the proffered nondiscriminatory explanation should not be believed because it has no basis in fact; (2) a failure on the part of a defendant to follow its own policies; (3) defendant having given shifting reasons for the challenged decision; (4) defendant having treated similarly-situated employees in a disparate manner; and (5) defendant having been untruthful with respect to any explanations provided. See, e.g., St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993); Schaffhauser v. United Parcel Service, Inc., 794 F.3d 899, 904 (8th Cir. 2015). Notably, with respect to the credibility of the proffered nondiscriminatory reason along with possible

---

[6]    The record does not reflect whether there were persons in these positions in 2012 or whether these exact positions still existed. In the absence of other evidence, a fair inference here is that Korte likely was the functional equivalent of the "production manager."

untruthfulness - both of which are of some concern here, the Supreme Court in <u>St. Mary's Honor Center</u> stated the following:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination,[4] and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is required," 970 F.2d, at 493 (emphasis added). But the Court of Appeals' holding that rejection of the defendant's proffered reasons compels judgment for the plaintiff disregards the fundamental principle of Rule 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the "ultimate burden of persuasion."

<u>Id.</u> at 511(footnote and quoting authority omitted).

In this case, Hart has offered several arguments for why a jury could conclude that enforcement of the educational requirement as to him (including the decision not to continue the waiver of the educational requirement he was previously granted or granting a new waiver) was pretextual.  The obvious one is the fact that Hart had previously been employed by RRI for almost four years after having been granted a waiver, which then raises the question of why it was so important when Hart applied for reemployment that he now have a GED and that the earlier waiver of the requirement should not be continued or a new one granted on the same basis as before.  This is particularly true given the lack of any evidence that Hart's lack of a GED during the four years he did work for RRI had been an impediment to his performance, and more particularly, his ability to perform the work in a safe manner.[7]   In this instance, a jury could conclude that the lack of a credible explanation to this question is evidence of pretext.

---

[7]  Of course, there is the one incident of Hart having engaged in a fight that obviously was a safety concern, but RRI's policies allow inmates who have been disciplined to apply for employment following a waiting period.  (Doc. No. 32-3, p. 2).  Moreover, the reason for the denial contemporaneously given by Korte at that time was Hart's failure to meet the educational requirement and not the one incident of fighting.  Further, Korte stated in the communication that Hart could reapply once he obtained his GED.  If defendants take the position now that the real reason why his application was denied was the fighting incident, then a jury could consider this to be shifting reason for the denial given what Korte stated in the denial communication and other record evidence.

A second argument that Hart makes for pretext is the specific reason he contends the waiver was granted to him initially. Hart claims the reason why prison officials granted him a waiver the first time was that they recognized he was incapable of meeting the educational requirement and the significance of this will become more obvious from what follows later, including the fact that waivers were granted to others for the same reason and that defendants now in their second motion to dismiss state they are willing to waive the educational requirement for Hart (although not guarantee reemployment) because of his learning disabilities. While defendants will undoubtedly contend this was only a recent discovery, there is evidence that at least creates an inference otherwise.

Finally, Hart also contends that the educational requirement was not being enforced as to others who were not black. Before turning to the evidence on this point, it is helpful first to explain what happened during the summary judgment briefing with respect to this point and the earlier point that Hart had previously been given a waiver and had already worked for RRI for some four years without the lack of a GED being a problem.

Undoubtedly anticipating that these issues were going to be a problem, defendants attempted to address them up front in an affidavit supplied by RRI Director Gardner that accompanied defendants' motion for summary judgment. In his affidavit, Gardner suggested that he, unlike his predecessor, was not willing to waive the educational requirement because of safety concerns and that his no-more-waiver policy had been strictly followed and that all of the persons who had been employed at RRI after he had become Director had satisfied the educational requirement and the couple of inmates who were working for RRI when he had taken over and who did not have a high school degree or GED were now gone. In relevant part, Gardner stated under oath the following:

20.     I have not waived the education requirement for any applicant for employment at RRI from the time I became Director of RRI.  I enforce the eligibility requirements for the safety and security of the staff of RRI and inmates of NDSP.  The work inmates perform at RRI can be dangerous for themselves and others if the inmates are not educated and do not possess the skills to operate the tools and machinery at RRI.  I decided that the education requirement should not be waived for Hart out of concern for the safety and security of the staff or [sic] RRI and inmates of NDSP.

22.     There are no inmates currently working at RRI who are also attending Read-Write classes or other classes to obtain a GED.  All inmates currently working at RRI have a high school diploma.

23.     Although there previously had been two non-minority inmates working at RRI that did not possess a high school diploma or GED because of a waiver they received from the previous director of RRI, those two inmates have both lost their employment at RRI.  If they were to reapply for employment with RRI, I would not grant them an exception to the RRI educational requirement.  They would not be considered for employment at RRI until after they receive their high school diploma or GED.

(Doc. No. 32-1, p.4).

Hart responded to defendants' motion for summary judgment by making the arguments set forth above for why imposition of the educational requirement, despite his previously having been given a waiver, was pretextual. And, responding in particular to the foregoing representations made by Gardner, Hart contended there were at least nine others employed by RRI who had not met the educational requirement, including at least two who had been hired after Gardner had become the Director.  (Doc. Nos. 38, pp. 1-2; 38-2, pp. 1-2).

Defendants did not reply to Hart's specific arguments of pretext.  Rather, defendants shifted gears and filed a second motion to dismiss contending that there is now no live case or controversy because prison officials have now decided that Hart has learning disabilities and, for this reason, any new application for reemployment by Hart would not be rejected because he was lacking a high school degree or GED.

There may be a couple of reasons why defendants did not attempt to directly refute Hart's arguments of pretext.  One may be that they have no ready answer for Hart's contention that the

17

waiver he received back in 2007 was granted because it was recognized by prison officials at the time that he was not capable of obtaining a GED. As noted earlier, defendants have carefully avoided the subject of what the actual reason was for Hart's waiver. The other reason appears to be that Gardner was forced to acknowledge that his earlier representations with respect to the qualifications of those presently working at RRI were inaccurate.

In a second affidavit filed in support of the new motion to dismiss, Gardner acknowledged that RRI had in fact hired two persons since he had become Director who had neither a high school degree nor a GED at the time they were hired. In an attempt to mitigate the damage of these admissions, Gardner stated that one of the two was: (1) hired to work in the commissary by the NDDOCR staff member in charge of the commissary; (2) that he [Gardner] was not aware of the hire or the lack of a GED or diploma; and (3) that this inmate was mentally disabled and unable to obtain his GED. (Doc. No. 43-1, p. 2, ¶ 6). Gardner contended with respect to the other inmate, who was hired to work in the license plate making division, that "we did not intentionally hire this individual without a GED or diploma," and that the inmate did subsequently obtain his GED. (Id. at ¶ 8).

In addition to these two inmates, Gardner also acknowledged there was one other inmate still working at RRI without a high school degree or GED but contended this inmate was hired in 1994 during the time of the prior RRI Director and that he was unable to meet the educational requirement. (Id. at ¶ 7).

As the Supreme Court made clear in the passage from St. Mary's Honor Center quoted earlier, a jury is permitted to consider these inaccurate statements not only in evaluating the credibility of any further explanations and whether the proffered nondiscriminatory reason was pretextual but also as additional circumstantial evidence in support of the merits. Further, in this

particular instance, a jury could conclude that the explanations subsequently given for the misstatements are also further evidence of pretext.

More particularly, a jury could draw the inference from the hiring of the two persons after Gardner became the Director that the purported educational requirement was honored only in the breach and not regularly enforced. Also, while defendants do not acknowledge the race of these two individuals, it appears clear after comparing the affidavits of Gardner and Hart that at least one was white and most likely the other, if not white, was at least not black.

Further, Gardner's suggestion that the inmate who was hired on his watch to work in the commissary without meeting the educational requirement should be discounted because he was mentally disabled does not square with the purported explanation that the educational requirement is important for safety reasons. One would think that a mentally disabled person might be more of an issue for the type of risks that defendants have claimed was the reason why Gardner had purportedly adopted a no-more-waiver policy on account of safety and that, at the very least, a person with Hart's four-year track record of being able to perform the work would have been perceived to be a better risk. On the other hand, if the safety risk can be alleviated for those with mental disabilities or there are some jobs that can be performed that possess a lower risk (which the undersigned suspects), why then was Hart not continued on his past waiver or given a new one, at least for the same types of work, particularly if his inability to meet the educational requirement was the reason for his waiver the first time around as Hart contends?

As for the other individual who was hired on Gardner's watch to make license plates, the suggestion that he eventually obtained a GED some six months later is also disingenuous. First, if safety was a concern, what about the six months or so when prison officials would have been

uncertain whether or not the individual was going to complete his GED? Why would Hart have not been a better risk given his actual track record of performing work without any claimed safety problem? Also, part of Hart's complaint was that he was not given the same opportunity, *i.e.*, working at RRI while attempting to satisfy the educational requirement by attending read-write classes.

Finally, the same holds true for the third individual who defendants acknowledge still works at RRI without a high school degree or GED, but who defendants attempt to explain away as having been granted a waiver by the prior director back in 1994. Defendants acknowledge this person was also granted a waiver because he was not capable of meeting the educational requirement. But surely, if safety was of such a concern, this individual could have been processed out of RRI and reemployed elsewhere within the NDSP.[8]

In short, even the explanations offered by defendants for why the court should ignore the persons similarly situated who were hired and not required at the time of hiring to meet the educational requirement, or who had been hired and allowed to work without meeting the educational requirement, further support Hart's claim of pretext.

A fourth argument of pretext is the fact that defendants have now shifted gears and claim that a high school degree or GED will no longer be required of Hart because they have now determined

---

[8] Hart claims there were at least nine persons working for RRI who had not met the educational requirement. Defendants suggested in their reply to Hart's response to their second motion to dismiss that this contention should not be given credence because it is hearsay. In their more recent affidavits filed in support of the second motion to dismiss in which they were forced to admit Hart was at least partially correct, defendants appear to suggest that the three persons discussed above are now all of the persons who had not met the educational requirement. But, these conclusory representations, including who had satisfied the educational requirement and who had not, are also hearsay.

At this point, if defendants want to prove there were in fact no more persons than the ones they have admitted to, they will need to come forward with proof that not only is not hearsay but also is compelling in view of their prior misstatements, *e.g.* records showing all of the persons who had worked at RRI during the relevant time frame, the dates they were hired, their race, and the relevant portions of their prison records documenting their educational status both at the time of hiring and thereafter.

that he has learning disabilities. But what about the no-more-waiver policy because of safety concern that RRI Director Gardner appears to suggest was the original reason for the denial of Hart's request for reemployment? What about the fact that Hart was given a waiver initially and his claim that the reason why was because it recognized back at that time he was incapable of satisfying the educational requirements?

In summary, not only is it possible that a jury could conclude that the proffered reason of Hart needing to obtain a GED before he would be considered for reemployment was pretextual, the probability of that seems rather high in view of the foregoing with the real question being whether it was pretext for an act of racial discrimination or for something else, *e.g.*, the effective decisionmaker(s) personally disliking Hart or viewing him as being a troublemaker. And here, while some of Hart's arguments that it was pretext for an intentional act of racial discrimination have more force than others, Hart has provided sufficient evidence to overcome defendants' proffered nondiscriminatory reason for why he was not considered for reemployment, such that they are not entitled to summary judgment on that basis.[9]

> **c. Whether there is sufficient evidence to create an issue of racial discrimination for the jury**

While McDonnell Douglas provides a framework for plaintiffs being able to go forward with a circumstantial case for racial discrimination as well as for weeding out those claims that are not trialworthy, the burden of persuasion at all times remains upon Hart to demonstrate that he was in fact the victim of an act of racial discrimination. And, to circle back to whether Hart has presented

---

[9] What has not received much discussion is Hart's claim that Korte and other RRI supervisors *frequently* made racially disparaging remarks about blacks (including the use of the "N-word") while Hart was working there and that Hart complained about it. At this point, the court must accept this evidence as true, given that this is a motion for summary judgment. Also, and while it may have been because of this, defendants have not offered any contrary evidence - not even an affidavit from Korte denying that he or any of his supervisors had acted in such a fashion.

sufficient evidence to make out a case for the jury, it appears that Hart's claim of intentional racial discrimination will likely rise or fall on whether he can persuade a jury that Korte was effectively the decisionmaker. This is because Hart has not at this point presented enough evidence from which a reasonable jury could conclude that any of the other defendants, including Gardner, exhibited any racial animus.[10]

Gardner claims in his first affidavit that Korte was "not responsible for decisions regarding the hiring of applicants at RRI" and further claims that Korte was not the "*final* decisionmaker" in the decision to deny Hart's application but did go on to say that Korte "would forward the application to the hiring committee for consideration of whether the applicant meets all eligibility criteria." (Doc. No. 32-1, p. 3, ¶ 19) (italics added). Gardner also claims in a separate paragraph that he decided the educational requirement should not be waived for Hart because of the importance of the educational requirement for RRI workplace safety. (Id. at p. 4, p. 20).

The problems with all of this are several and include the following:

- Gardner never fully addressed the process that was *actually* followed with respect to the enforcement of the educational requirement in this particular instance - much less back that up with any documents that may have been created with respect to the processing and denial of Hart's application.[11] Rather his affidavit statements are an

---

[10] The only evidence that Hart has proffered, aside from the allegedly frequent racially disparaging remarks by Korte and other NDSP RRI supervisors (for which there is no evidence that any other defendant in this case had knowledge), is the fact that a small number of non-black inmates were allowed to work for RRI without first meeting the educational requirement. The fact that these inmates were not black alone would be insufficient to draw an inference of racial discrimination without more information. Cf. Tyler v. University of Arkansas Bd. of Trustees, 628 F.3d 980, 990 (8th Cir. 2011) (no inference of gender discrimination could be drawn because of the small universe of applicants). The evidence only takes on some potential significance when married with other evidence of racial animus.

[11] Noticeably absent from the present record are any internal NDSP and RRI communications and documents having to do with Hart's application and its denial. When Hart came forward with the written denial signed by Korte in response to defendants' motion for summary judgment, defendants did not attempt to rebut any of the inferences that

odd combination of vague statements that purport to suggest what happened with statements about what usually would happen.  In particular, he couples his statement that Korte was not the "final" decision maker with the statement that Korte "would forward" the application to some committee without affirmatively stating this actually is what happened in this particular instance.  This leaves open several other possibilities.  One is that, while that may have been what was supposed to have happened, it was not the course of action taken in this particular instance, that Korte made the decision, and that any purported decision later by Gardner (if there was one) was nothing more than after-the-fact rubber stamp.  It also leaves open the possibility that Korte did forward the application but at the same time "recommended" denial based on Hart not meeting the educational requirement and the reality was that no one was going to be hired that Korte did not want working for him.

- Gardner is not specific as to when he claims he purportedly decided that Hart should not be considered for reemployment because of the importance of the educational requirement safety. For all the court knows from his vague and conclusory statement, he may have made *his* decision after the decision was essentially made by Korte or even after Korte had communicated the denial to Hart.

- RRI's own policies as well as those of the NDSP describing employment at RRI do not on their face limit the hiring decision or the grant of a waiver of the educational requirement to the RRI Director.  In particular, RRI's policy does not state who does

---

may be drawn for this document and the other record evidence and, instead, filed the motion to dismiss claiming that the case is now moot.

the hiring specifically and the NDSP's job policies state that: "RRI staff will interview the inmate and decide if a job will be offered." (Doc. Nos. 32-3, 43-3, p.4). Further, as quoted earlier, RRI's own policy states that the waiver of the educational requirement can be made by the Deputy Director of Industries and Education and there is also the provision that extends the authority to waive all RRI policies to this person and the "production manager." (Doc. No. 32-3, pp. 1, 6).

- Finally, there is the other circumstantial evidence which suggests that Gardner's vague, conclusory, and (from all appearances) carefully-parsed statements should not be taken at face value. First, defendants have offered no real explanation for why, if Korte was not really involved in the hiring process as Gardner appears to suggest, the denial of Hart's application came from Korte and not someone else. Second, Gardner's explanations for how the two persons he had to acknowledge were hired on his watch without first meeting the educational requirement support at least an inference that Gardner did not closely supervise the hiring process and that the line managers at the various penal institutions (including Korte at the NDSP) were the effective decisionmakers. This essentially was Gardner's explanation for how the one person got hired to work in the commissary, *i.e.,* the commissary manager hired the inmate and Gardner was not aware of the hire at the time. It also appears likely this is what happened for the other inmate who was hired to work making license plates (although Gardner is vague about the exact circumstances of that hire) and a fair inference from this record is the manager in that instance would have been Korte.

In short, based on the limited record before the court, reasonable jurors could conclude that, in this

instance, Korte was the one who decided he did not want Hart back and gave as a reason the educational requirement. Further, reasonable jurors could also conclude conversely, that, if Korte had been in favor of hiring Hart that might very well have ended the matter either because Gardner would have deferred to Korte's decision (particularly in view of the unique circumstances where Hart had previously been granted a waiver and Hart's reemployment could presumably be justified on that basis) or, just as probably, in view of the other evidence that the purported no-more-waiver policy was not being strictly enforced and the actual line managers were making their own decisions (including Korte) or, even worse, that the purported policy is nothing more than an after-the-fact construct.

In summary, while Hart's claim of intentional racial discrimination is by no means overwhelming, it does appear that a jury could conclude *based on the record that is now before the court* that: (1) Korte was the person who effectively made the decision that Hart would not be considered for reemployment because he was lacking a high school degree or GED; (2) that Korte's reliance upon this requirement, despite the fact it had previously been waived for Hart, was pretextual; and (3) that the real reason why Korte imposed the requirement was racially-based, with the circumstantial evidence of that being primarily Hart's affidavit testimony that Korte and other RRI Supervisors *frequently* made racially discriminating remarks about black inmates working at RRI, and, to a much lesser extent, some evidence that at least one, but probably more, non-black inmates had treated differently in terms of being hired by RRI without first meeting the educational requirement as well as defendants' misstatements and evidence that the proffered reason for the denial was pretextual. Cf. Burton v. Arkansas Secretary of State, 737 F.3d at1229-35; Borrego v. Nelnet, Inc., No. 4:14-cv-3024, 2016 WL 1092472, at **8-11 (D. Neb. March 21, 2016).

Consequently, it will be recommended that defendants' motion for summary judgment be denied.

## III.   HART'S RETALIATION CLAIM

Defendants contend that Hart's § 1983 retaliation claim should be dismissed because the Equal Protection Clause does not encompass a right to be free of from retaliation.  Even if that is the law,[12] Hart clearly alleged a claim for retaliation in his complaint and, given the fact that he is proceeding pro se, the court should allow the claim to go forward notwithstanding his failure to explicitly reference the First Amendment as well as the Equal Protection Clause.  Further, for the same reason, the factual allegations of Hart's complaint encompass a claim under 42 U.S.C. § 1981 and that statute has been construed as encompassing a retaliation claim.  See, e.g., CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008) (§ 1981 encompasses retaliation claims and extends to claims by those who suffer retaliation for having tried to help others); Ellis v. Houston, 742 F.3d 307, 319 (8th Cir. 2014).[13]

As for defendants' remaining arguments for why any claim for retaliation should be dismissed, what has been stated above with respect to Hart's claim of intentional racial discrimination applies to Hart's claim of retaliation against his allegedly having spoken out against frequent racial slurs purportedly being made by Korte and other RRI supervisors at the NDSP - at least with respect to the motion for summary judgment.  See, e.g., Ellis, 742 F.3d at 319 (Section 1981 retaliation claims "are analyzed under the same McDonnell Douglas burden shifting

---

[12]  In Burton v. Arkansas Secretary of State, 737 F.3d 1219 (8th Cir. 2013), the Eighth Circuit noted that it had not yet decided whether the Equal Protection Clause provides a basis for a retaliation claim pursuant to § 1983 for a person who alleges retaliation for having complained about racial discrimination and cited a number of cases that suggest it does not and that any such claim must be founded upon the First Amendment. Id. at 1236 & n.7. The court in Burton did not resolve the issue because it needed only to conclude that any such right under the Equal Protection Clause was not clearly established to resolve the case on qualified immunity grounds.

[13]  If Hart has satisfied the statutory prerequisites for a Title VII claim, then he also would have retaliation claim under that Title.

framework as Title VII claims."); <u>Skalsky v. Independent School Dist. No. 743</u>, 772 F.3d 1126, 1130-31 (8th Cir. 2014)  (setting forth the elements of a First Amendment retaliation claim and applying the burden-shifting framework set forth in <u>Mt. Healthy City Sch. Dist. v. Doyle</u>, 429 U.S. 274, 287 (1977)).  Consequently, it will be recommended that summary judgment with respect to this claim be denied.

## IV. <u>CLAIMS AGAINST DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES</u>

Defendants in their motion for summary judgment seek dismissal of the individual capacity claims against Bertsch, Schmalenberger, and Korte based on lack of evidence of their involvement in the rejection of Hart's application for reemployment.  Defendants argue with respect to the first two that there is no evidence that they were personally involved in the actual decision whether or not Hart should be rehired and, with respect to Korte, that he was not the "final" decisionmaker.  Also, all of the defendants argue that they are entitled to qualified immunity because "there is no factual basis upon which it could be found State Defendants violated Hart's federal rights."


For the most part, the distinctions between individual and official capacity claims in this case are of little practical import because Hart does not seek damages and the prospective injunctive relief that he asks for can be issued against one or more of defendants in their official capacities. <u>See</u>, <u>e.g.</u>, <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 71 n.10 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State.") (internal quotation marks omitted). ( <u>Mix v. Norman</u>, 879 F.3d 429, 423 (8th Cir. 2004) ("Under <u>Ex Parte Young</u>, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a state officer who

violates the United States Constitution acts without state authority and is thus subject to suit."). That being said, there may be a question with respect to individual liability for attorneys fees if the court appoints counsel and Hart later succeeds on the merits, even though there may also be official capacity liability for such fees as well.[14]

Consequently, it will be recommended that the individual capacity claims be dismissed against defendants Bertsch, Schmalenberger, and Gardner because Hart has failed to proffer sufficient evidence of either any racial animus on their part or that they acted with the requisite retaliatory motive.

## V. DEFENDANTS' SECOND MOTION TO DISMISS

### A. Additional background

After Hart's application for reemployment was turned down, he was placed in an educational program so he could work towards obtaining a GED. Initially, it was represented to higher authorities within the NDDOCR that Hart was doing well. Whether that was accurate or not, defendants now claim he has learning disabilities - a conclusion that Hart claims, as already discussed in detail, that prison authorities had long ago reached when he was granted a waiver of the educational requirement and allowed to work the first time.

Following Hart's response to defendants' motion for summary judgment, defendants filed the second motion to dismiss on September 8, 2015. Defendants now contend in this motion that Hart "will no longer be denied employment at RRI for failure to meet the educational requirement" because of the purported recent determination he has learning disabilities. (Doc. No. 43, p.2). Defendants further contend, for reasons discussed in more detail in a moment, that this effectively

---

[14] See, e.g., Missouri v. Jenkins, 491 U.S. 274, 278-80 (1989); Fitzpatrick v. Bitzer, 427 U.S. 445 (1976).

leaves the court without a case or controversy to decide, so it should be dismissed for lack of subject

matter jurisdiction.[15]

But simply stating that Hart will no longer denied employment at RRI because of the lack

of a GED says nothing about whether Hart would ever seriously be considered for reemployment,

whether he would have to go to the end of any waiting list, or even whether defendants would still

give preference to those with a high school degree or GED, which, as a practical matter may mean

Hart's name will never come up.   Further, these are not just idle concerns.   In his initial affidavit,

Gardner stated:

> 21.      RRI currently has around forty inmates on the job waiting list who meet all the
> necessary eligibility requirements to work at RRI.   Because there are plenty of
> interested and qualified inmates, there is no need to waive education requirement for
> any inmates at this time.

---

[15] Defendants state in support of the second motion to dismiss that "[t]here are currently two other inmates working at RRI who have exited the DOCR education program for lack of ability to obtain their GED." (Doc. No. 43, p.4).  Why defendants are making this point is unclear.  But, if it is an attempt to persuade the court that there are others who have been treated the same as Hart in terms of their being required to go through an educational program and failing before they would be granted a waiver and allowed to work at RRI, it should be taken with a grain of salt in the absence of actual proof.  In fact, the affidavit that the brief appears to rely upon for this point does not state that the two persons apparently being referred to went through the educational program.  Rather, for both, the affidavit only states that the educational requirement was waived because the inmates in question were not capable of obtaining a GED.  (Doc. No. 43-2, p.2).

Also, somewhat curiously, defendants cite as authority for being able to waive RRI's educational requirement for Hart not only the proviso in RRI's policy that a waiver of the requirement can be granted based on extraordinary circumstances, which clearly would permit the waiver, but also a DOCR policy for "Employment for Inmates with Disabilities," which, on its face, does not apply for several reasons.  The portion of the policy that defendants point to is subpart 5(C)(2), which reads:

> If an inmate has a disability, the Job Placement Committee may waive the work requirement with no
> termination of privileges.  This will only apply in extreme cases and will usually require medical or
> psychiatric approval.

(Doc. No. 43-3, p.p. 2-3). First, the subpart talks about a waiver of the "work requirement,"not a waiver of any educational requirement.  Second, when the entire subpart 5 is considered, it is clear the "waiver" that  5(C)(2) refers to is a waiver of the NDSP's "work requirement" in 5(A) that all inmates must engage in some sort of work (with work being defined to include in some instances completing educational programs) and has nothing to do with employment with RRI or its educational requirement. Finally, the entire policy on its face is DOCR policy for the NDSP, not the RRI.

Why defendants point to this policy in their brief is unclear, but it does little to enhance the credibility of their overall arguments.

(Doc. No. 32-1, p.4).

Further, it was not clear from what was submitted back in September as to when Hart would be considered eligible to reapply because both defendants' brief and one of the supporting affidavits stated that, at the time of the filing of the motion, the NDDOCR was "preparing to *begin* the formal exit process from DOCR education program . . . ." (Doc. Nos. 43, p.1; 43-2, p. 2) (emphasis added). The implication, however, was that Hart would not have become eligible to reapply until he was finally processed out of the educational program.

After defendants' motion for summary judgment and motion to dismiss came up in the queue for consideration and upon reading the second motion, the undersigned held a status conference on March 30, 2016, in hopes the case may have become moot by Hart having been rehired by RRI during the almost seven months from when defendants filed the motion to dismiss. However, not only had Hart not been rehired by RRI, he had not even been formally processed out of the educational program until two days before the status conference.[16]

## B.     Discussion

The grounds for defendants' second motion to dismiss is lack of jurisdiction. Defendants' argument more particularly is that: (1) there is no longer a case or controversy for the court to decide because, according to defendants, Hart's requests for injunctive and declaratory relief as to him have been mooted by defendants having decided now that his lack of a GED will not used as a reason for denying him reemployment at RRI; and (2) Hart lacks standing to seek declaratory and injunctive relief on behalf of other prisoners that would stop the practice of requiring a GED for

---

[16]   While the order scheduling the status conference was issued the day prior, the undersigned's staff began contacting the parties prior to that day to find a date that would work with both. It may be mere coincidence that after almost seven months Hart was finally processed out the educational program two days before the status conference. The undersigned is not so sure, however.

some inmates, but granting waivers for others, including allowing some, but not all equally, to attend read-write classes while working at RRI.

Hart's standing to seek the broader relief need not be decided at this point because defendants' representation that it will not now deny Hart reemployment based on his lack of GED does not moot his case. For one thing, while Hart's requests for injunctive and declaratory relief are somewhat inarticulately stated, the essence of what he has seeks in part is that the court order his reemployment at RRI, even though at the time he made the request it was that the court force defendants to allow him to work at RRI while he was attending read-write classes. Cf. Whitson v. Stone County Jail, ("We do not hold [plaintiff's] inartful pleadings or responses against her as she proceeds pro se."). But, even if the court should not so construe Hart's pleading, he should be given an opportunity to amend his request for injunctive relief in light of defendants' substantial change in their position.

Also, even if ordering that Hart be reemployed is not appropriate relief (a subject the parties can brief later), there likely are other things that the court could do to correct the racial discrimination and/or retaliation that will have been determined to have occurred *if* plaintiff prevails on the merits. For example, it likely would be within the broad power of the court in fashioning an appropriate remedy to order that, at the very least, Hart be placed at position on any waiting list dating back to when he was unlawfully denied reemployment, which by this time, may place him at the front of the line or very close to it. Further, the court likely would also be able to retain jurisdiction to insure that any denial of employment after his place in line came up is based on legitimate grounds and not the result of further discrimination or retaliation. Also, retaining jurisdiction would insure that, while professing not to consider Hart because of a lack of high school

degree or GED, defendants do not take the position that they will first give preference to those with a high school degree or GED and effectively block him from getting to the front of the line.

In short, defendants offer to take off the table Hart's lack of a GED does not fully moot his claim of intentional racial discrimination because there is other non-monetary relief the court could order. Consequently, defendants' second motion to dismiss should be denied unless Hart is returned to employment at RRI before the court has the opportunity to rule, which would then truly moot the case.

## VI.    RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** as follows:

1.    Defendants' Motion for Summary Judgment (Doc No. 31) be **GRANTED IN PART** to the extent that this action be dismissed as to defendants Bertsch, Schmalenberger, and Gardner in their individual capacities, but otherwise **DENIED** as to the remainder of the motion;

2.    Defendants' Motion to Dismiss (Doc. No. 42) be **DENIED;** and

3.    Hart's motion for appointment of counsel (Doc. No. 44) be **GRANTED**.

### NOTICE OF RIGHT TO FILE OBJECTIONS

Pursuant to D.N.D. Civil L.R. 72.1(D)(3), any party may object to this recommendation within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file appropriate objections may result in the recommended action being taken without further notice or opportunity to respond.

Dated this 9th day of May, 2016.

*/s/ Charles S. Miller, Jr.*       
Charles S. Miller, Jr., Magistrate Judge
United States District Court